WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Rozann G. Bergdale,<br><br>    Plaintiff,<br><br>vs.<br><br>Countrywide Bank FSB; Bank of America, National Association; and John Does,<br><br>    Defendants. | No. CV-12-8057-PCT-GMS<br><br>**ORDER** |

  Pending before the Court is a Motion to Dismiss Second Amended Complaint (Doc. 27) filed by Defendants Countrywide Home Loans, Inc., Bank of America, N.A., BAC Home Loan Servicing LP, Mortgage Electronic Registration Systems, Inc., and ReconTrust. For the following reasons, the Court grants in part and denies in part the motion.

## BACKGROUND

  Plaintiff Rozann Bergdale purchased a home in Yavapai County, Arizona, around October 26, 2007. (Doc. 21 ¶ 14; *id.*, Ex. A at 1-3.)[1] To finance this purchase, she obtained a loan of $576,000.00 from Defendant Countrywide Bank. (*Id.*, Ex. A at 1-2.) The parties executed and recorded the Deed of Trust ("DOT") in the office of the

---

[1] The Court takes judicial notice of the DOT and subsequent assignments because they are documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading," *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) (alteration in original).

Yavapai County Recorder on Oct. 31, 2007. (*Id.* ¶ 14.) The DOT designates Countrywide as the "Lender," Fidelity National Title Insurance as the "Trustee," and Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") as "the beneficiary under this Security Instrument" and "nominee for Lender and Lender's successors and assigns." (*Id.* Ex. A at 1-2.) Subsequently, Defendant Bank of America acquired Countrywide, and Defendant BAC Home Loan Servicing, a Bank of America subsidiary, began servicing the loan. (*Id*. ¶¶ 2, 5-6.)

Bergdale's monthly payment, including principal, interest, escrow, and other charges was originally $3,195.50. (*Id*. ¶ 29.) At some point, Bergdale missed a monthly payment, but she alleges that she made up for that missed payment in various monthly "installments," totaling $2,500.00. (*Id.* ¶¶ 30, 37.) In October 2009, Bergdale entered into a three-month "Trial Modification Program" with BAC that temporarily reduced her monthly payment to $2,325.00. (*Id.* ¶ 31.) She negotiated with BAC for her first trial program payment to occur on November 17, 2009. (*Id.*) Bergdale contacted BAC on November 13 to determine whether check she sent for the first trial payment had posted. (*Id.* ¶ 34.) The BAC representative could not see the payment and recommended that Bergdale send another check. (*Id.*) The BAC representative assured her that any previous check she had sent for the November payment, if found, would be cancelled to avoid duplicate payments. (*Id.*)

On November 23, 2009, BAC delivered a Notice of Intent to Accelerate that claimed Bergdale owed $9,007.80 on the loan and threatened to institute foreclosure if she did not cure. (*Id.* ¶ 36.) Bergdale alleges that "NO PAYMENT WAS LATE AT ALL", and claims she was current on her payments. (*Id.* ¶ 37.) She reached out to BAC and was informed that her balance was now $4,650.00 because BAC had applied two payments of $2,325.00 to her account. (*Id.* ¶¶ 38-39.) Bergdale filed a letter of dispute asserting that BAC had posted the second November payment in error and requesting reimbursement for the overdraft fees she incurred as a result of the second November payment. (*Id.* ¶ 40.) After Bergdale sent her letter of dispute, BAC told her that she

actually owed $4,372.80 on her loan. (*Id.*) Subsequently, she received a second Notice of Intent to Accelerate that stated she owed $4,372.00, but was then told on a phone call that she actually owed $7,568.30. (*Id.* ¶¶ 40-41.) The dispute over what Bergdale owed stretched into December. (*Id.* ¶¶ 43-45, 47.) There was also a dispute between Bergdale and BAC as to whether she had been paying property taxes. (*Id.* ¶¶ 33, 41-42.) Throughout the back-and-forth with BAC, Bergdale denied any delinquency. (*Id.*) Outside of phone calls, though, no specific action was taken by either party at this time.

Bergdale made six months of payments in the amount specified in the previous three-month trial program. (*Id.* ¶¶ 48-49.) The following November, BAC and Bergdale agreed to a permanent loan modification. (Doc. 21-5, Ex. E at 1.)[2] Bergdale agreed that she owed $604,324.81, an addition of about $25,000 to the principal. (*Id.*; *id.* ¶ 50.) The parties also agreed that, beginning December 1, 2010, Bergdale's monthly principal and interest payment would be $2,163.39 until December 2013, when it would increase. (Doc. 21-5, Ex. E at 3.)

When Bergdale received her statement on December 20, it offered three payment choices for the month of January: (1) An interest only payment of $2,395.39, consisting of a $1,510.81 interest payment plus $884.58 of "outstanding late charges" and "amounts collected for escrow items such as taxes and insurance premiums"; (2) a 15-year Amortized Payment Choice of $5,916.17, consisting of a principal and interest payment of $5,031.59 plus charges; and (3) an Amortized Payment Choice of $3,047.97, consisting of a $2,163.39 principal and interest payment plus charges. (Doc. 21-6, Ex. F at 3.)[3] Bergdale selected the interest-only payment and made the $2,395.39 payment for both January and February. (*Id*. ¶¶ 52-53.)

She received a letter informing her that her March payment would increase to offset the interest-only payments she made for both January and February. (*Id*. ¶ 54.) The

---

[2] The Court takes judicial notice of the Loan Modification Agreement.

[3] The Court likewise takes judicial notice of the December 20 statement.

- 3 -

SAC does not allege what the revised payment was in March or anytime subsequent to that notice. Bergdale did, however, send a check in April for $3,156.14. (*Id.*) A Notice of Intent to Accelerate arrived on April 18, 2011, that claimed Bergdale owed $3,808.71. (*Id.* ¶ 55.)

On October 18, 2011, MERS assigned all of its beneficial interest under the DOT to Bank of America. (Doc. 21-2, Ex. B.) Bank of America then exercised its power as beneficiary to appoint ReconTrust Company as the successor trustee on November 29, 2011. (Doc. 21-3, Ex. C.) That same day, ReconTrust filed a Notice of Trustee's Sale to take place on March 7, 2012. (Doc. 21-4, Ex. D.) Bergdale received a copy of this Notice of Trustee's Sale. (*Id.* ¶ 56.) No sale appears to have taken place as of yet.

Bergdale filed a complaint against the Defendants in Arizona Superior Court on Mar. 2, 2012. (Doc. 1, Ex. 1), and the action was subsequently removed to this Court (Doc. 1). The Court granted Defendants' Motion to Dismiss the First Amended Complaint on September 18, 2012 (Doc. 20), giving Bergdale a "very limited opportunity to amend." She filed her SAC on October 17, 2012, and all Defendants filed the current Motion to Dismiss on November 5, 2012. (Doc. 27.)

## DISCUSSION

### I. LEGAL STANDARD

To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must contain more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action"; it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Twombly*, 550 U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When a complaint does not "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation omitted).

When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

## II. ANALYSIS

Bergdale's SAC contains five counts against the Defendants: (1) Consumer Fraud, (2) Quiet Title, (3) Breach of the Duty of Good Faith and Fair Dealing, (4) Negligent Performance of an Undertaking, and (5) Violations of the Fair Debt Collection Practices Act. (Doc. 21 ¶¶ 93-180.) Bergdale requests declaratory, injunctive, and monetary relief. For the reasons discussed below, Bergdale has stated a claim against Bank of America and BAC for consumer fraud and breach of the duty of good faith and fair dealing. She has failed to state a claim with regard to the remaining Counts and Defendants.

### A.    Consumer Fraud

Bergdale alleges that Bank of America and BAC violated Arizona's Consumer Fraud Act ("CFA"), A.R.S. § 44-1522A, which prohibits the use of "any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." "To succeed on a claim of consumer fraud, a plaintiff must show a false promise or misrepresentation made in connection with the sale

or advertisement of merchandise and consequent and proximate injury resulting from the promise." *Kuehn v. Stanley*, 208 Ariz. 124, 129, 91 P.3d 346, 351 (Ct. App. 2004). A plaintiff must also allege reliance—though it need not be reasonable—on the misrepresentations. *Id.* As discussed in the previous Order, the CFA applies to the origination or modification of a loan. (Doc. 20 at 8-9.)

Because Bergdale is bringing a fraud claim, she must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9 requires allegations of fraud be pled with particularity, even if they are brought under the [CFA]." *Silving v. Wells Fargo Bank, NA*, 800 F. Supp. 2d 1055, 1075 (D. Ariz. 2011); *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("It is established law, in this circuit and elsewhere, that Rule 9(b)'s particularity requirement applies to state-law causes of action. While a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule.") (internal quotation marks and citation omitted, alterations removed).

### 1. Lack of Authority to Foreclose

Part of the CFA claim rests on the theory that that Bank of America and BAC "engaged in deceptive acts or practices in servicing of Plaintiff's loan by representing that it had authority to enforce her Note and to foreclose on behalf of the claimed Trust, when it had knowingly failed to properly transfer the interest in the Note to the Trust." (Doc. 21 ¶ 94.) The Court has previously recognized that the documents attached to the SAC (whose authenticity Bergdale does not contest) refute the claim that Bank of America lacked authority to foreclose. (Doc. 20 at 5-7.) As Bergdale herself alleges, Bank of America acquired Countrywide, her original lender. (Doc. 21 ¶ 2.) Bank of America therefore succeeded to Countrywide's interest in the Note, and then became the beneficiary under the DOT via assignment. Bergdale attempts to challenge the validity of these transactions by once again mounting sweeping arguments against the MERS

system. The Court need not cover the same ground, except to note again that there is no "legal support for the proposition that the MERS system of securitization is so inherently defective so as to render every MERS deed of trust completely unenforceable and unassignable." *In re Mortgage Elec. Registration Sys. (MERS) Litig.*, MDL 09-2119-JAT, 2011 WL 4550189 at *4 (D. Ariz. Oct. 3, 2011); *see also Hogan v. Wash. Mutual Bank, N.A.*, ___ Ariz. ___, ___, 277 P.3d 781, 783 (2012); *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1042 (9th Cir. 2011) ("None of their allegations indicate that the plaintiffs were misinformed about MERS's role as a beneficiary, or the possibility that their loans would be resold and tracked through the MERS system . . . . By signing the deeds of trust, the plaintiffs agreed to the terms and were on notice of the contents."). Bergdale has not shown that statements of authority at the origination and modification stages of the loan were fraudulent or misrepresentations. Bergdale's consumer fraud claim fails to the extent it relies on these discredited theories.

## 2. Practices in Servicing Loan

Another part of Bergdale's claim is based on allegations that Bank of America and BAC engaged in deceptive practices while servicing her loan. (*Id.* ¶ 96.) Bergdale complains of the following actions of Bank of America and BAC in November and December 2009: threatening foreclosure even though Bergdale was making timely payments, misapplying her payments, misrepresenting amounts owed, and declaring a false default. (*Id.*) Specifically, over the course of two weeks in November 2009, different BAC representatives told Bergdale that she owed anywhere from $4,650.00 to $4,372.80 to $4,372.00 to $7,568.30 to $7,712.30. (*Id.* ¶¶ 36-48). Throughout this process, Bergdale received notices of intent to accelerate. (*Id.*) Bergdale maintains that she was not in default at the time. (*Id.* ¶¶ 37, 40, 42.)

Taking the allegations of the SAC as true at this stage, Bergdale does not have a viable CFA claim. Assuming the CFA applies to servicing activity, Bergdale failed to allege detrimental reliance on the alleged misrepresentations in November and December 2009. *See Kuehn*, 208 Ariz. at 129. Bergdale continued to pay the $2,325.00 trial

payment throughout this period—there is not allegation of a material change in position or additional, unwarranted payments made as a result of Bank of America and BAC's alleged false claims. (*Id.* ¶¶ 48-49.) Bergdale attempts to connect the Fall 2009 activity to the Final Loan Modification Agreement in November of 2010 (*id.* ¶¶ 50-51, 97-100), but she does not allege how those statements influenced the modification agreement, or how she was in any way damaged by them, other than to say, apparently, that the statements reflected that she held unequal bargaining power. Such allegations are insufficient under Rule 9's heightened pleading requirement. The alleged misrepresentations of November and December 2009 regarding the amount owed cannot support a claim under the CFA.

### 3. Double-posting November 2009 Payment

Bergdale also claims she was defrauded when the Defendants double-posted her November 2009 trial payment. She alleges that she had made one payment in mid-November of $2,325.00 that did not show up in BAC's computers. (*Id.* ¶ 34.) A BAC representative then asked her to submit another payment and stated that her previous payment, if it came through, would be cancelled. (*Id.*) Instead, BAC posted both payments, despite Bergdale's alleged lack of default at the time. (*Id.* ¶¶ 38-39.)

Defendants' only argument for dismissing this claim is that there was no loss because the trial program required three monthly payments and Bergdale's account was credited for both. On the contrary, assuming application of the CFA to these claims, Bergdale has alleged a misrepresentation, reliance, and consequent damage. BAC allegedly misrepresented that it would apply only one payment, when it actually applied two. She relied on that misrepresentation and submitted a second payment. When both payments were applied, she suffered overdraft charges and was unable to pay her bills. (*Id.* ¶ 39.) BAC's solitary argument to the contrary is unpersuasive, and Bergdale may proceed with a CFA claim on this theory.

### 4. Loan Modification

Bergdale also alleges that Bank of America and BAC violated the CFA by misrepresenting the terms of the loan modification. (*Id.* ¶ 96.) Under the final

- 8 -

modification, Bergdale's principal and interest payment was set at $2,163.39. (Doc. 21-5, Ex. E at 3.) Her December 2010 statement, however, offered three payment choices, all of which differed from the $2,163.39 specified in the final modification: (1) $2,395.39 (interest-only), (2) $5,916.17 (15-year amortized payment), and (3) $3,047.97 (amortized payment). (Doc. 21-6, Ex. F at 3.) Nevertheless, the third choice—the "Amortized Payment Choice"—references the principal and interest payment agreed upon in the modification: $2,163.39. (*Id.*) The confusion arises because the "Total Payment Amount" included certain "Outstanding Late Charges" and an escrow payment. (*Id.*) As Bank of America and BAC point out, nowhere in the Final Modification Agreement does Bank of America represent that Bergdale's *total* payment would be $2,163.39. Indeed, the DOT specifies that escrow items and late charges can be included in the total payment. (Doc. 21-1, Ex. A ¶ 1.)

Bergdale alleges, however, that her total payment, including escrow, should have been "approximately $2,450/month", several hundred dollars less than the amount appearing on her December statement. (Doc. 21 ¶ 51.)[4] Bergdale alleges that BANK OF AMERICA and BAC made numerous miscalculations regarding the required escrow payment, and those miscalculations could have resulted in requiring her to pay more for escrow than she needed to. (*Id.* ¶¶ 33, 42-43.) Here, therefore, Bergdale has alleged both a misrepresentation—claiming that she owed more for escrow than she actually did—and detrimental reliance—making the wrong payment for two months, which led to increased payments she was unable to afford. (*Id.* ¶ 55.) Bank of America and BAC's arguments to the contrary go to the question of the amount of the escrow payment, a factual issue inappropriate for consideration on a motion to dismiss.

In short, Bergdale's SAC alleges a viable CFA claim with respect to the claims of double payment and misrepresenting the amount owed under the Final Loan Modification. The remaining allegations of fraud are dismissed.

---

[4] The statement references an escrow balance of $1,617.30, but not how much was included in a given payment. (Doc. 21-6, Ex. F at 3.)

- 9 -

### C.  Quiet Title

Bergdale reasserts her quiet title claim against the Defendants under A.R.S. § 12-1101, which states that "[a]n action to determine and quiet title to real property may be brought by anyone having or claiming an interest therein, whether in or out of possession, against any person or the state when such person or the state claims an estate or interest in the real property which is adverse to the party bringing the action." Most of Bergdale's supporting allegations are based on the theory that Defendants lack authority to initiate foreclosure proceedings because they are unable to produce the note at foreclosure or that the documents purporting to transfer the interest were false. The Court's previous Order rejected the grounds on which Bergdale is claiming a lack of authority. (Doc. 20 at 6-7.) Once again, Bergdale's claim is really a challenge to the MERS system surrounding securitization of mortgages. The Defendants are not required to record changes in ownership of the note between MERS members within the MERS system as the securitization process unfolds. *See Cervantes*, 656 F.3d at 1038-40. The remaining allegations set forth by Bergdale address the loan servicing and modification process and cannot support a quiet title claim. That claim is dismissed.

### D.  Breach of Good Faith and Fair Dealing

Bergdale also contends that Bank of America and BAC breached their duty of good faith and fair dealing. (Doc. 21 ¶¶ 125-45.) "Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). "The implied covenant of good faith and fair dealing prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Id.*

Bergdale's good faith claim sounds in both tort and contract. She asserts that Bank of America and BAC, "exercising the threat of foreclosure at all times, used a contract negotiation to manipulate bargaining power to their own advantage". (Doc. 21 ¶ 127.) Beyond these conclusory statements, however, Bergdale has offered no supporting

allegations. She does not describe how she was injured, other than general assertions that she was harmed by entering into a modification agreement that was less than ideal. (*Id.* ¶ 145.) Moreover, "[a] party may bring an action in tort claiming damages for breach of the implied covenant of good faith . . . only where there is a 'special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility.'" *Ariz. Laborers*, 201 Ariz. at 491 (quoting *Burkons v. Ticor Title Ins. Co. of Cal.*, 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991)). Bergdale has not pled the existence of a such a special relationship arising from "elements of public interest, adhesion, and fiduciary responsibility." *Burkons*, 168 Ariz. at 355. She cannot assert a tort claim.

On the other hand, Bergdale has stated a claim under a contract theory. "When the remedy for breach of the covenant sounds in contract, it is not necessary for the complaining party to establish a special relationship." *Ariz. Laborers*, 201 Ariz. at 491. She contends that the Defendants "did not honor the terms of the Final Loan Modification" by issuing the December 2010 statement that required escrow payments allegedly in excess of what she owed, as discussed above. (Doc. 21 ¶ 128.) That allegation, taken to be true, states a claim that Defendants breached the modification agreement. Consequently, Bergdale's good faith claim survives on this basis alone.

The remaining allegations are a list of apparent practices of the Defendants. (*Id.* ¶¶ 132-144.) Bergdale does not allege how she was harmed by some of these practices and cites inapplicable, non-binding settlement agreements for others. As for the claims of misapplication of payments, discussed above, simple negligence does not amount to a breach of the duty of good faith. *See Ariz. Laborers*, 201 Ariz. at 491. Bergdale may, however, advance her claim on the theory that Bank of America and BAC did not honor the terms of the Final Loan Modification.

### E.     Negligent Performance of Undertaking

Bergdale's fourth claim for relief is for negligent performance of undertaking. (Doc. 10 ¶¶ 165-80.) This "Good Samaritan" doctrine allows recovery from those who undertake "to render services to another which he should recognize as necessary for the

protection of the other's person or things" but fail to exercise reasonable care in the performance of the undertaking. *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 176 Ariz. 247, 250, 860 P.2d 1300, 1303 (Ct. App. 1992); Restatement (Second) of Torts § 323. The Good Samaritan doctrine applies to allegations of both physical and economic harm. *Id.* Liability attaches when the party's "failure to exercise [reasonable] care increases the risk of [physical or economic harm] or [t]he harm is suffered because of the other's reliance upon the undertaking." *Id.*

Bergdale's chief accusation is that Defendants "encourage[d] her to make payments under the Trial Modification Plan so she could obtain a similar Permanent Modification on the same terms." (Doc. 21 ¶ 152.) Her payment under the permanent modification, however, differed from the terms of the trial modification. Bergdale does not allege how the Defendants failed to exercise reasonable care in crafting a modification for her. Indeed, the fact that she received a modification indicates that Defendants sought to help Bergdale avoid foreclosure. The remaining allegations go to the breach of contract claim considered earlier. The Court does not see how those claims fit within the parameters of the Good Samaritan doctrine. Therefore, Bergdale's Good Samaritan claim is dismissed.

### F.     Fair Debt Collection Practices Act

Bergdale alleges that the Defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, et. seq (2006). But the Court dismissed this claim as a matter of law in the prior order, and Bergdale was not at leave to bring it again. (Doc. 20 at 14) ("Any count that has been dismissed as a matter of law, should not be amended.") As the Court previously held, the FDCPA does not apply to any of the alleged actions by the Defendants because mortgagees and their beneficiaries are not debt collectors and a non-judicial foreclosure proceeding is not the collection of a debt under the FDCPA. *See Mansour v. Cal-W. Reconveyance Corp.*, 618 F. Supp. 2d 1178, 1182 (D. Ariz. 2009); *Diessner v. Mortgage Elec. Registration Sys.*, 618 F. Supp. 2d 1184, 1188-89 (D. Ariz. 2009) *aff'd sub nom. Diessner v. Mortgage Elec. Registration Sys., Inc.*, 384 F. App'x 609

(9th Cir. 2010). Bergdale's FDCPA claim is also dismissed.

## CONCLUSION

Two of Bergdale's claims survive. She may proceed on a theory that BAC and BANK OF AMERICA violated the CFA and breached their duty of good faith by (1) double posting her November 2009 trial modification payment and (2) offering her materially different terms in the December 2010 invoice than were required by the Final Loan Modification. The remainder of the SAC fails to state a claim as a matter of law, and the remaining Defendants are dismissed.

**IT IS HEREBY ORDERED** that the Motion to Dismiss filed by the Defendants (Doc. 27) is **granted in part and denied in part.**

Dated this 9th day of January, 2013.

*/s/ A. Murray Snow*
G. Murray Snow
United States District Judge